IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

LEWIS POWELL,

    Plaintiff

v.

CITY OF LA VERGNE, TENNESSEE,

JASON COLE,
ANDREW PATTON, and
BURREL DAVIS,

    Defendants

---

## COMPLAINT
---

The Plaintiff, Lewis Powell, hereby brings suit against the Defendants as follows:

## INTRODUCTION

1) In this case, the CITY OF LA VERGNE and its officials investigated and publicized, for no reason other than prurient interest, the sex lives of various officers in its Police Department. Then they terminated and defamed all the officers involved — except for those who were white and male — based at least partly on racial prejudice.

1

## THE PARTIES

2) The Plaintiff, LEWIS POWELL, is a private citizen of Tennessee who was formerly a police officer of the La Vergne Police Department. Before the termination discussed herein, he had a stellar, honorable record over many years of service in the Department.

3) Defendant CITY OF LA VERGNE, TENNESSEE is a political subdivision of the State of Tennessee. Among other functions, it runs the La Vergne Police Department.

4) Defendant JASON COLE is the Mayor of the CITY OF LA VERGNE. He is being sued individually.

5) Defendant ANDREW PATTON is the Human Resources Director for the CITY OF LA VERGNE. He is being sued individually.

6) Defendant BURREL ("CHIP") DAVIS, during the events described herein, was the Chief of Police for the La Vergne Police Department. Currently he is a private citizen of Tennessee. He is being sued individually.

## FACTUAL BACKGROUND

### *A Brief Dating Relationship*

7) During April through May 2022, Plaintiff LEWIS POWELL casually dated fellow police officer Maegan Hall, for roughly a month.

2

8) Notably, the CITY OF LA VERGNE has a rather vague policy stating that if two police officers ever "establish[]" a "personal, sexual, or romantic relationship," then they should notify a supervisor. Policy 3.4.C. That way, the City can assess whether the relationship creates any undue risk of a conflict of interest.

9) Here the "relationship" lasted only a relatively short time — arguably never even "established" in any formal sense. Regardless, around the same time that it ended, Powell also notified Chief BURREL DAVIS about the relationship, saying that it was now over.

10) Under the circumstances, no formal policy barred POWELL from dating Hall.

11) Regardless, even if POWELL had violated the above policy, he was never actually disciplined for it. Instead, as discussed below, ultimately he wound up getting disciplined on other purported grounds.

12) Regrettably, throughout the year 2022, Officer Hall slept around with a number of other police officers — not just POWELL.

13) On December 08, 2022, she then experienced a mental breakdown, and she was hospitalized.

### Investigation of Lewis Powell

14) On December 12, 2022, Mayor COLE somehow learned that Hall had not only experienced the breakdown, but had engaged in sexual intercourse with multiple police officers.

15) Aroused with righteous indignation that his officers had committed fornication under his watch, Mayor COLE and Director PATTON determined to get to the bottom of the situation and uncover every juicy detail.

16) Mayor COLE is a final policymaker for the CITY OF LA VERGNE.

17) Pursuant to his authority, Mayor COLE ordered PATTON to investigate the sex lives of his police officers, and to generate a public record thereon.

18) Human Resources Director PATTON quickly went about obeying the order without question. To carry out the investigation, he also enlisted the help of Police Chief DAVIS.

19) Chief DAVIS already knew that POWELL had briefly entertained a romantic relationship with Hall. Specifically, he knew because POWELL had already informed him.

20) By informing him, POWELL had complied with Policy 3.4.C., and DAVIS knew it.

21) As Chief of Police, DAVIS was a final policymaker for the CITY OF LA VERGNE on Police Department matters.

22) DAVIS also knew other material facts about the subject of the investigation generally — namely, Officer Maegan Hall and her sexual exploits with various officers. But for whatever reason he failed to disclose them initially.

23) In the lead-up to the investigation, Chief DAVIS even ordered POWELL to lie if questioned about the relationship — to deny that anything had even occurred at all.

24) DAVIS then participated in the investigation and interrogation of POWELL.

25) On December 13, 2022, Defendants PATTON and DAVIS investigated POWELL by dragging him in for interrogation without warning, without any notice of the specific allegations, and without giving him any opportunity to refuse to answer questions or to obtain counsel.

26) During the first interrogation, POWELL was asked whether he ever dated or engaged in sexual activity with Hall. Chief DAVIS sat in. Obeying the Chief's prior instruction, POWELL falsely denied everything. He said that he had not engaged in any relationship with Hall.

27) DAVIS did not reveal that POWELL had already admitted the relationship to him.

28) At the end of the first interrogation of POWELL, Defendants PATTON and DAVIS forbade him from consulting or discussing the matter with anyone.

29) After releasing him from the interrogation, they decided to investigate further by surreptitiously tracking the Global Positioning System (GPS) on POWELL's work-supplied cell phone. They also did the same with Officer Hall's phone.

30) POWELL (not to mention Hall) had a reasonable expectation of privacy in his own movements, as reflected by the coordinates on his phone GPS.

31) Alternatively, PATTON and DAVIS utilized only cell-site information (comparable to GPS, but somewhat less precise).

32) Even if so, POWELL had a privacy interest in his cell-site data, too.

33) Defendants PATTON and DAVIS never obtained a warrant or court order to justify the tracking of POWELL's (or Hall's) cell phone.

34) A week later, during a second interrogation of POWELL about his sex life, Defendants PATTON and DAVIS confronted him with his movements based on having tracked the phones. Specifically, they saw that he had met with Officer Hall at the parking lot of a local gym.

35) During the meeting, he had discussed with Hall his fears about the ongoing situation.

36) At the second interrogation, PATTON and DAVIS rebuked POWELL for meeting with Officer Hall, and for discussing the investigation. After all, they had previously forbidden him from speaking.

37) Since he had violated their gag order, PATTON decided to add a new disciplinary charge of "intentional interference with an investigation."

38) Further, PATTON told him that if they learned that he had spoken out again, then they would punish him by converting his paid administrative leave to unpaid.

39) They advised POWELL that he would be disciplined, and ultimately fired, if he did not confess that he met with Hall, and if he did not recount the substance of their conversation.

40) By talking with Officer Hall at the gym, POWELL had engaged in speech, apart from his official duties as a police officer.

41) The speech had involved a matter of public concern, namely a disciplinary investigation against numerous officers.

42) Finally, POWELL simply needed to be able to consult *someone* about the ongoing, stressful threat to his career — whether it be an attorney, friend, colleague, pastor, therapist, or whomever. Yet he was gagged. In this situation, the government did not have any valid interest that might override POWELL's First Amendment rights.

43) Next, PATTON and DAVIS accused POWELL of engaging in sexual activity with Officer Hall while on police property, while also on the clock.

44) At first, POWELL denied the accusation.

45) But the two men quickly advised POWELL that if he did not confess, then he would be disciplined and ultimately fired.

46) Upon being coerced in this way, POWELL told them what they wanted to hear: That Officer Hall had performed oral sex upon him inside a police building.

### *The City's Public Allegations of Sexual Harassment*

47) While investigating whether any sex had occurred, PATTON and DAVIS interrogated Officer Hall herself (among other people) a total of three times. The first time, she denied any romantic or sexual relationships with any other officers. The second and third times, though, she did admit to a relationship and sexual contact with POWELL. But she flatly said that it was consensual. She further said that POWELL had ended things voluntarily, upon learning that she slept with another man.

48) Despite the absence of any allegation that POWELL ever pressured or bullied Hall, or caused any non-consensual sexual interaction, Defendants PATTON and COLE wrote down on his public personnel file that he had engaged in "sexual harassment." Further, they wrote the same allegation in their other public reports and documents generated about the scandal.

49) Defendants COLE and PATTON fired Plaintiff POWELL on January 4, 2023. Officially, he was fired for sexual harassment, and for falsely denying his involvement with Hall.

50) They also fired other officers around that same time, including Officer Hall.

51) Besides the general allegation of sexual harassment, they also listed in their public reports all the sordid details about the sex acts of POWELL and the other officers.

52) Still, despite being public record, practically speaking the documents about the salacious sex allegations might have remained relatively private — had they not been intentionally publicized.

53) But on information and belief, Mayor COLE then leaked the investigation to the television news media. He did so to score political points for being tough on sexual immorality.

54) The sex scandal then became a worldwide news and internet phenomenon. From the resulting publicity, POWELL suffered widespread public ridicule.

55) Consequently, POWELL has been unable to find work anywhere else as a police officer, and he has lost income and earning capacity.

## *Racial Discrimination*

56) POWELL is black — a member of a protected class.

57) In fact, *all* the individuals terminated in the sex scandal were either female (Officer Hall), or else males of minority races (POWELL, along with three other black males and one Hispanic male).

58) Multiple officers who engaged in similar conduct, but who were white and male, were left on the force.

59) In the years leading up to the firings, Chief DAVIS had been known for hiring or promoting a significant number or black or minority officers, diversifying the Police Department.

60) However, certain individuals in the city government had felt aggrieved at the diverse racial makeup. Consequently, Defendants COLE and PATTON took the opportunity during the sex scandal to set things right — by firing the minority officers.

61) In June 2023, POWELL filed a claim with the Equal Employment Opportunity Commission, asserting racial discrimination and exhausting his remedies thereon.

62) The EEOC issued a right-to-sue letter on November 20, 2023.

## *Miscellaneous Allegations*

63) Finally, for all relevant acts in this case, the Defendants acted under color of law — whether as government officers, or as a municipality.

64) As a result of all the wrongs alleged herein, POWELL has suffered severe embarrassment and damage to his reputation, acute emotional distress, loss of enjoyment of life, medical (psychological) expenses, lost wages, and lost earning capacity.

65) All the wrongs alleged herein were committed intentionally, wantonly, or maliciously, so as to warrant punitive damages.

# CLAIMS FOR RELIEF

## COUNT I

## VIOLATION OF INFORMATIONAL RIGHT TO PRIVACY

## 42 U.S.C. § 1983

### *(All Defendants)*

66) The other sections are incorporated by reference.

67) By investigating the Plaintiff's sex life, making its personal and humiliating details a public record, and then releasing the information publicly — all without any compelling government interest — Defendants JASON COLE, ANDREW PATTON, and BURREL DAVIS violated the his informational right to privacy. Said right is guaranteed by the Fourteenth Amendment. *See Bloch v. Ribar*, 156 F.3d 673, 683-86 (6th Cir. 1998). They did so under color of law.

68) The CITY OF LA VERGNE is also liable for the wrongdoing because COLE and DAVIS were final policymakers for the CITY OF LA VERGNE.

## COUNT II

## VIOLATION OF THE FREEDOM
## OF INTIMATE ASSOCIATION

## 42 U.S.C. § 1983

*(Cole, Patton, and City of La Vergne)*

69) The other sections are incorporated by reference.

70) By firing the Plaintiff for engaging in a sexual relationship with a co-worker, where no formal policy even prohibited the conduct,[1] Defendants JASON COLE and ANDREW PATTON abridged the Plaintiff's freedom of intimate association as guaranteed by the Fourteenth and First Amendments. They did so under color of law.

71) The CITY OF LA VERGNE is also liable because COLE is a final policymaker.

---

[1] The Sixth Circuit uses strict scrutiny to review formal prohibitions on dating that would bar a plaintiff's access to a large portion of the dating pool — or rational basis scrutiny where the policy would leave much of the dating pool open. *Anderson v. City of La Vergne*, 371 F.3d 879 (6th Cir. 2004). But without any formal policy barring the relationship, the level of scrutiny is a non-issue. The court must simply ask whether the government retaliated for the exercise of the right. *Vaughn v. Lawrenceburg Power System*, 269 F.3d 703, 712 (6th Cir. 2001).

13

## COUNT III

## ABRIDGING THE FREEDOM OF SPEECH

## 42 U.S.C. § 1983

### *(Patton, Davis, and City of La Vergne)*

72) The other sections are incorporated by reference.

73) By forbidding the Plaintiff to speak about the ongoing investigation with anyone, and also by later disciplining him in part for having done so, Defendants ANDREW PATTON and BURREL DAVIS abridged the Plaintiff's freedom of speech as guaranteed by the First Amendment. They did so under color of law.

74) The CITY OF LA VERGNE is also liable because DAVIS was a final policymaker.

## COUNT IV

## UNREASONABLE SEARCH

## 42 U.S.C. § 1983

*(Patton, Davis, and City of La Vergne)*

75) The other sections are incorporated by reference.

76) By tracking the Plaintiff's phone without a warrant (or any valid exception), Defendants ANDREW PATTON and BURREL DAVIS committed an unreasonable search in violation of the Fourth Amendment. They did so under color of law.

77) The CITY OF LA VERGNE is also liable because DAVIS was a final policymaker.

## COUNT V

## EQUAL PROTECTION VIOLATION

## 42 U.S.C. § 1983

### *(Cole, Patton, and City of La Vergne)*

78) The other sections are incorporated by reference.

79) By disciplining the Plaintiff more harshly because of his race, namely by firing him, Defendants JASON COLE and ANDREW PATTON violated his right to the equal protection of law, as guaranteed by the Fourteenth Amendment. They did so under color of law.

80) The CITY OF LA VERGNE is also liable because COLE is a final policymaker.

# COUNT VI

## LIBEL

## TENNESSEE COMMON LAW

### *(Cole and Patton)*

81) The other sections are incorporated by reference.

82) By falsely labeling the Plaintiff a perpetrator of sexual harassment in the public written reports and public personnel file (even though the investigation revealed that the relationship was consensual), by doing so with knowledge that the label was false or with reckless disregard for the truth, and by thus causing harm to his reputation, Defendants JASON COLE and ANDREW PATTON committed libel in violation of the Tennessee common law.

## JURISDICTION

83) A federal District Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the lawsuit raises federal questions. Further, the Court has jurisdiction over the state-law claim under 28 U.S.C. § 1367 because it arises from the same nucleus of fact.

84) This Court in Tennessee has personal jurisdiction over the Defendants because they are citizens of Tennessee.

85) Venue is proper in the Middle District of Tennessee (Nashville Division) because the incidents occurred mainly in Rutherford County, Tennessee.

## RELIEF SOUGHT

PREMISES CONSIDERED, Plaintiff Lewis Powell prays for the following:

i) A jury trial;

ii) Backpay and front pay;

iii) $3,000,000 in compensatory damages;

iv) Additional punitive damages in a reasonable amount, as set by the trier of fact (sought against everyone except for the City of La Vergne);

v) Reasonable attorney's fees, per 42 U.S.C. § 1988; and

vi) Any further relief that the Court deems appropriate, such as taxing costs to the Defendants.

Respectfully submitted,

/s/ Drew Justice
Drew Justice #29247
Attorney for Lewis Powell
1902 Cypress Drive
Murfreesboro, TN 37130
(615) 419-4994
drew@justicelawoffice.com